**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) CECIL GUTHRIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 15-CV-162-JHP |
| | ) | |
| (1) JEFFREY GRAGG, a Muskogee  County | ) | |
| Deputy Sheriff in his individual capacity; | ) | |
| (2) KENT BARBER, a Muskogee County | ) | |
| Deputy Sheriff in his individual capacity; | ) | |
| (3) BOARD OF COUNTY COMMISSIONERS | ) | |
| FOR MUSKOGEE COUNTY, OKLAHOMA, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION & ORDER

Before the Court is a Motion for Summary Judgment filed by Defendants Jeffrey Gragg,

Kent Barber, and the Board of County Commissioners for Muskogee County, Oklahoma (Doc.

No. 54).  After consideration of the briefs, and for the reasons stated below, the Motion is

**GRANTED IN PART**.

## BACKGROUND

On the evening of April 3, 2014, Rick Grimes made a 911 call requesting deputy

assistance at 319 East Main Street in Wainwright, Oklahoma.  (Doc. No. 54-1 ("Recording of

911 Call")).  Mr. Grimes stated his wife, Denise Grimes, had taken "a bunch of pills" and was

"out of control."  (Recording of 911 Call).  Muskogee County Deputy Sheriffs Jeffrey Gragg and

Kent Barber separately responded to the dispatch call.  (Doc. No. 54-4 ("Gragg Case Report");

Doc. No. 54-5 ("Barber Case Report")).  Both deputies had some familiarity with Denise Grimes

and her history of psychiatric problems:  Gragg had served a protective order filed by Mr.

Grimes against her on April 2, 2014, at a psychiatric hospital (Gragg Case Report), and Barber

had responded to two previous calls for assistance when she had attempted suicide (Doc. No. 64-6 ("Barber Deposition"), 25:15-27:12).  On the evening of April 3, Mrs. Grimes had swallowed almost an entire prescription of Xanax in an apparent suicide attempt.  (Doc. No. 64-3 ("Denise Grimes Deposition"), 46:2-11).

By the time Mr. Grimes made the 911 call, Denise Grimes had already left her house at 319 East Main Street.  She walked first to a neighbor's house, then to a field, where her sixty-nine-year-old father, Plaintiff Cecil Guthrie, picked her up in his truck.  (Doc. No. 64-1 ("Plaintiff Deposition"), 50:12-52:3, 75:15-20).  Plaintiff then drove over to the parking lot of the Wainwright Church of Christ, where EMS first responders were already waiting to treat Mrs. Grimes.  (Plaintiff Deposition, 53:11-56:1).  Mrs. Grimes' cousin, Twila Hollis, and Plaintiff's wife, Patty Guthrie, were also waiting in the parking lot.  (Doc. No. 64-2 ("Patty Guthrie Deposition"), 35:7-16; Doc. No. 64-4 ("Hollis Deposition"), 30:4-10).  Mrs. Grimes was upset and did not want to go back to the hospital for treatment.  (Denise Grimes Deposition, 52:15-16).  EMS personnel approached Plaintiff's truck, and Plaintiff advised them he was trying to settle down his daughter and needed "a couple of minutes."  (Plaintiff Deposition, 58:13-59:12).  In addition to being Mrs. Grimes' father, Plaintiff was then pastor of the Boynton Assembly of God Church.  (Plaintiff Deposition, 19:8-13, 20:16-22).  Twila Hollis approached the truck from the passenger side, where Mrs. Grimes was seated, and advised Mrs. Grimes to allow EMS to treat her.  (Hollis Deposition, 30:25-31:17).  Shortly thereafter, Gragg arrived at the scene, with Barber arriving a few seconds after Gragg.  (Barber Deposition, 21:22-22:12).  The situation was calm when Gragg approached, and there were no raised voices or other signs of threatened or actual violence.  (Hollis Deposition, 32:6-10, 92:9-93:5; Doc. No. 64-5 ("Gragg Deposition"), 103:18-104:7, 105:6-12; Barber Deposition, 32:13-19).

At this point, the facts become hotly disputed. Plaintiff's version of events is as follows: Gragg approached Plaintiff's truck without first speaking to witnesses on the scene to assess the situation. (Patty Guthrie Deposition, 84:23-85:7). As Gragg approached the driver's side of the truck he yelled at Plaintiff to "step out of the vehicle." (Patty Guthrie Deposition, 35:12-16, 56:2-6; Denise Grimes Deposition, 52:22-25). Plaintiff rolled down the window slightly and raised his hand, telling Gragg that he was counseling his daughter and asking for a moment. (Plaintiff Deposition, 62:1-6; Patty Guthrie Deposition, 56:8-11, 60:14-21; Barber Case Report). As Plaintiff turned back to his daughter to continue counseling her, Gragg reached into the truck, grabbed Plaintiff's arm, and yelled at Plaintiff to "get out." (Plaintiff Deposition, 62:10-64:8; Denise Grimes Deposition, 57:9-58:1). Gragg said he was going to taser Plaintiff. (Plaintiff Deposition, 64:22-65:9). Gragg then, without provocation, fired his taser at Plaintiff with his free hand. (Plaintiff Deposition, 102:6-9). Plaintiff's truck had been in drive during this time, and Plaintiff's foot had been on the brake, but Plaintiff's truck did not move before Plaintiff was struck with the taser. (Plaintiff Deposition, 102:6-9, 103:18-104:2, 107:14-17; Patty Guthrie Deposition, 61:10-18, 76:21-24; Denise Grimes Deposition, 59:8-22). The taser shock caused Plaintiff to lose consciousness. (Plaintiff Deposition, 102:6-9, 104:3-5). When Plaintiff lost consciousness, his foot slipped off the brake and the truck began to roll. (Plaintiff Deposition, 65:25-66:11; Patty Guthrie Deposition, 76:17-24; Hollis Deposition, 90:10-14). Gragg's arm was trapped in the partially rolled up window, and Gragg began trotting along with the slowly rolling truck. (Patty Guthrie Deposition, 57:8-25). Gragg was able to reach in with his free hand and put the truck in park after it had rolled some distance. (Plaintiff Deposition, 104:6-9). Plaintiff then regained consciousness and EMS approached to treat him. (Plaintiff Deposition, 69:8-20).

Gragg's version of events is dramatically different:  When Gragg arrived on the scene, Gragg was approached by an EMS first responder who told him the driver would not let Mrs. Grimes out of the truck and that she had a short window of time to receive necessary medical attention.  (Gragg Case Report; Gragg Deposition, 105:19-106:1; 161:20-22; 164:2-4; Barber Deposition, 22:13-19).  At this point, Gragg thought Mr. Grimes was the driver, not Plaintiff, and that Mr. Grimes would not let Mrs. Grimes leave the truck.  (Gragg Case Report).  Gragg thought he was facing a "hostage situation."  (Gragg Deposition, 163:2-6).  Gragg approached the truck on the driver's side.  Gragg "asked" the driver to let Mrs. Grimes out of the truck. (Gragg Case Report).  Plaintiff responded by striking Gragg on his chest with his left hand through the open window and stating that Mrs. Grimes was not getting out of the truck.  (Gragg Case Report; Gragg Deposition, 159:24-160:1, 174:7-8).  Gragg grabbed Plaintiff's arm with his right hand when Plaintiff struck Gragg on the chest, and Plaintiff pulled his arm back into the truck with Gragg holding on to it.  (Gragg Deposition, 173:17-21, 174:7-10).  Gragg reached into the window with his left hand and attempted to grab the keys and turn off the engine.  (Gragg Deposition, 174:10-14).  Plaintiff then partially rolled up the window, trapping Gragg's right arm.  (Gragg Deposition, 174:14-19).  Plaintiff placed the truck in drive and began to drive while dragging Gragg.  (Gragg Deposition, 177:4-9, 179:21-180:9).  Gragg warned Plaintiff to stop the vehicle or he would be tasered, but Plaintiff ignored him.  (Gragg Case Report).  Then Gragg grabbed his taser with his left hand and tasered Plaintiff through the partially open window. (Gragg Case Report).  The truck came to a stop, and Gragg placed the truck in park.  (Gragg Case Report).  Plaintiff rolled the window up, snapping off the Taser wires, and pressed his foot on the gas.  (Gragg Case Report).  The truck did not move because it was in park.  (Gragg Case Report).  Gragg then opened the driver's door, removed the keys from the ignition, and told

Plaintiff he would taser him again if Plaintiff did not comply. (Gragg Case Report). Plaintiff then became compliant, and Gragg removed the taser probes. (Gragg Case Report).

During the disputed events, Barber was standing near the passenger side of the truck. (Barber Deposition, 22:18-19). He testified that when the truck started to roll, he had to move out of the way or his foot would have been run over by the truck's back tire. (Barber Deposition, 15:10-18). Barber then moved around to the driver's side of the truck behind Gragg. (Barber Deposition, 22:23-23:3). Barber witnessed part of the struggle between Gragg and Plaintiff: he saw Gragg reaching into the vehicle, Gragg's arm becoming trapped in the window, the vehicle starting to roll, and Gragg firing his taser. (Barber Deposition, 22:20-23:3, 25:2-6). Barber heard Gragg warn Plaintiff to stop the vehicle or he would taser Plaintiff. (Barber Deposition, 51:16-25). Barber testified he was not in a position to act to protect Plaintiff from any of the actions Gragg took against Plaintiff. (Barber Deposition, 37:22-38:14). Witness Patty Guthrie, who was standing next to the truck on the driver's side, also testified that Barber was still eight to ten feet behind her by the time the truck stopped rolling. (Patty Guthrie Deposition, 65:12-20).

Though the events themselves are disputed, witnesses agree they were over in a matter of seconds. (Hollis Deposition, 47:13-18; Patty Guthrie Deposition, 65:21-25). Following the disputed events, Plaintiff was checked by EMS personnel on the scene and transported to Eastar hospital, where he was treated and released. (Plaintiff Deposition, 69:13-23, 70:10-25, 75:1-14). Plaintiff was never arrested or charged as a result of these events. (Plaintiff Deposition, 74:15-25).

Plaintiff filed a Complaint against the Defendants on May 1, 2015. (Doc. No. 3). Plaintiff asserts a total of four causes of action against the Defendants: (1) relief under 42 U.S.C.

§ 1983 against Gragg and Barber for unlawful use of excessive force; (2) relief under the Oklahoma Governmental Tort Claims Act ("OGTCA"), OKLA. STAT. tit. 51, §§ 151 *et seq.* against the Board of County Commissioners for Muskogee County, Oklahoma ("Board") for excessive force/assault and battery; (3) recovery under 42 U.S.C. § 1983 against Gragg and Barber for unconstitutional deprivation of liberty/unlawful seizure of person; and (4) relief under the OGTCA against the Board for false imprisonment. Plaintiff also seeks punitive and exemplary damages against all Defendants. (Doc. No. 3, ¶¶ 44-79).[1]

On May 2, 2016, all Defendants filed a Motion for Summary Judgment on all of Plaintiff's claims against them. (Doc. No. 54). Plaintiff filed a Response in opposition on May 22, 2016. (Doc. No. 64). Defendants filed a Reply on June 6, 2016. (Doc. No. 67).

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c). Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

---

[1] Defendant Charles Pearson, Jr. was dismissed from this case by Order on February 26, 2016. (Doc. No. 49).

## I.    Defendants Gragg and Barber

Plaintiff asserts two causes of action under 42 U.S.C. § 1983 against Gragg and Barber: unlawful use of excessive force (First Cause of Action) and unconstitutional deprivation of liberty/unlawful seizure of person (Third Cause of Action.).  Defendants argue these two causes of action are actually one claim, premised on the alleged unlawful use of excessive force on Plaintiff by Gragg.  In response, Plaintiff argues the seizure of Plaintiff in the form of detention creates a distinct cause of action in this case.  The Court agrees with Defendants there is no appreciable difference between the allegations in the First and Third Causes of Action.  (*See* Doc. No. 3, ¶ 45 ("Plaintiff was subjected to unlawful, unreasonable, and excessive force perpetrated by Defendant Jeffrey Gragg), ¶ 63 (Defendant Jeffry Gragg unlawfully seized Plaintiff's person by exerting unlawful and excessive force upon Plaintiff, rendering Plaintiff unable to move or leave the area.").  Accordingly, the Court will address both claims together by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person. *See Graham v. Connor*, 490 U.S. 386, 395 (1989).

### A.    Excessive Force – Gragg

Claims of excessive force committed by law enforcement during an investigatory stop or other "seizure" of a free citizen are evaluated under the Fourth Amendment to the United States Constitution and its "reasonableness standard."  *Graham*, 490 U.S. at 395.  This standard requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* at 396.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Id.* Accordingly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (citation omitted). The reasonableness determination must account for the "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances that police officers must often make. *Id.* at 397. However, the reasonableness inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id. See Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007) ("the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case.").

Here, Plaintiff alleges he was subjected to excessive force when Gragg yanked his left arm and discharged a taser gun at Plaintiff, subjecting him to an electrical shock. (Doc. No. 3, ¶¶ 45, 63). Gragg argues summary judgment on this issue is appropriate because, under the circumstances he was faced with on April 3, 2014, it was reasonable for him to fire a taser at Plaintiff. Specifically, Gragg argues his actions were objectively reasonable, because he was responding to a 911 call in which it was relayed that Mrs. Grimes had taken pills in an apparent suicide attempt. When Gragg arrived, EMS responders told him the driver of the truck would not let her out and she had a short window of time to receive necessary medical attention. The previous day, Gragg had served a protective order on Mrs. Grimes filed by her husband. Gragg argues it was reasonable under these circumstances for him to believe that Mr. Grimes was the driver and that Mrs. Grimes was in danger in a possible hostage situation. Gragg further argues that grabbing Plaintiff's arm and striking him with the taser were reasonable, because Plaintiff responded to Gragg's request to let Mrs. Grimes out of the truck by hitting Gragg on the chest

and saying Mrs. Grimes was not getting out of the truck. Further, Plaintiff rolled up Gragg's arm in the window, placed the truck in drive, and began to drag Gragg along with the truck. Gragg warned Plaintiff to stop the vehicle or he would fire his taser, but Plaintiff did not comply. Only then did Gragg fire the taser.

In support, Gragg cites several cases in which use of a taser was found to be reasonable. In *Hinton v. City of Elwood*, 997 F.2d 774, 776-77, 781 (10th Cir. 1993), the Tenth Circuit found it was reasonable for officers to use an "electrical stun gun" on a man who was stopped for the misdemeanor of disturbing the peace, when he was actively resisting the officers by "kicking his feet, flailing his arms, and biting the officers," and the officers warned him he would be arrested for disorderly conduct "if he engaged in one more outburst." Likewise, in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the Eleventh Circuit held it was not excessive for an officer to fire a taser at a driver who refused to provide his insurance information and bill of lading and was yelling loudly at the officer who pulled him over. The taser use was "reasonably proportionate" to the situation because the driver was belligerent and hostile, and he had refused five commands to retrieve his documents. *Id.* at 1278. *See also Nichols v. Davison*, 2005 WL 1950361, at *3 (W.D. Okla. July 26, 2005) (finding taser use was reasonable when individual did not respond to officers' oral commands, struggled with the officers, and began kicking at an officer); *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1173 (E.D. Cal. 2008) (finding taser use reasonable when officers are "physically struggling or wrestling with a suspect in order to gain control of the suspect."); *but see Casey v. City of Federal Heights*, 509 F.3d 1278, 1281, 1285-86 (10th Cir. 2007) (finding taser use excessive where used without warning against an individual who had "committed a misdemeanor in a particularly harmless manner" and who was not resisting the officer).

If Gragg's account of events is determined to be true, it may indeed be a reasonable use of force. However, the material facts Gragg raises are currently in dispute, and both sides have evidentiary support. On summary judgment, the Court is obliged to take the non-movant's version of events as true—here, Plaintiff's version. Witness Patty Guthrie did not see Gragg stop to speak with anyone when he arrived and marched to the Plaintiff's truck. (Patty Guthrie Deposition, 84:23-85:7).[2] By all accounts, Gragg was presented with no evidence indicating Mr. Grimes was driving the truck or that a "hostage situation" was taking place. (*See, e.g.*, Doc. No. 64-5 (Jeffrey Gragg Deposition), 163:7-10 ("Q: A hostage situation? Again, you don't know who this person was and no one ever said hostage to you; right? A: Right.")). It is certainly disputed whether the situation warranted such a quick response that Gragg could not approach any of the people around the truck, including Patty Guthrie or Twila Hollis, to assess the situation, inquire about the driver, and determine what action to take. As Gragg himself testified, the situation was calm when he arrived:

Q: Okay. Did you see any evidence of a dispute transpiring when you arrived?

A: No, sir.

Q: Okay. In fact, you saw no one yelling, no one demonstrating behavior that would be suggestive of a dispute; isn't that correct?

A: Correct.

Q: And, in fact, you didn't see anybody contending or fighting with one another; isn't that correct?

A: That's correct.

Q: In fact, you didn't see anyone actually committing any crimes when you appeared on the scene that day; isn't that correct?

---

[2] Witness Twila Hollis testified EMS responders approached one of the deputies to tell him "they need to get her out of that truck." (Hollis Deposition, 38:10-22). However, it is impossible to determine from the single-page excerpt of Ms. Hollis' testimony whether she is referring to Deputy Gragg or Barber. Even if the Court assumes Ms. Hollis was referring to Gragg, the content of Gragg's conversation with EMS remains disputed.

A: Correct.

Q: In fact, you did see that there were other people that were at the scene such as EMS; correct?

A: Correct.

***

Q: You saw other people that you learned to be family members, is that correct?

A: That's correct.

***

Q: And no one was in a rush to get to the truck, were they?

A: When I got there, they weren't, no.

Q: Everybody was standing by relatively peacefully; isn't that correct?

A: Yes

Q: And when you got there, you weren't—there was no need to immediately break up any type of disputed challenge, was there?

A: When I immediately got there, no.

(Gragg Deposition, 103:18-105:12). According to several witnesses, Gragg did not ask Plaintiff to let Mrs. Grimes out of the truck, but rather demanded Plaintiff exit the vehicle. (Patty Guthrie Deposition, 35:12-16, 56:2-6; Denise Grimes Deposition, 52:22-25). Plaintiff and Patty Guthrie testified, and Barber's Case Report stated, that Plaintiff advised Gragg he was counseling his daughter and asked for a few minutes. (Plaintiff Deposition, 62:1-6; Patty Guthrie Deposition, 56:8-11, 60:14-21; Barber Case Report). No witness except Gragg saw Plaintiff hit Gragg in the chest, and Plaintiff denies hitting Gragg. (Plaintiff Deposition, 105:25-106:9). It is also disputed whether Plaintiff shifted the truck into drive, and whether the truck started rolling before or after

Gragg hit Plaintiff with the taser. (Plaintiff Deposition, 102:6-9, 103:18-104:2, 106:10-18, 107:14-17; Patty Guthrie Deposition, 61:10-18, 76:21-24; Denise Grimes Deposition, 59:8-22).[3]

According to Plaintiff, Gragg encountered a calm situation in which a father was counseling his suicidal daughter, and emergency personnel were already standing by to assist when Mrs. Grimes exited her father's truck. In Plaintiff's version, Gragg utterly failed to assess the situation by consulting with any of the bystanders who could have informed Gragg that the Plaintiff was Mrs. Grimes' father. Plaintiff's version specifically refutes Gragg's account that Plaintiff was aggressive in any way toward Gragg. Instead, Gragg instigated the use of force without any justification and quickly escalated to use of his taser. Plaintiff's version could support the conclusion that Gragg's use of force was objectively unreasonable under the *Graham* factors. In other words, the severity of the crime committed by Plaintiff was non-existent, Plaintiff posed no immediate threat to the safety of the officers or others, and Plaintiff was not actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

Here the material facts are clearly disputed, and whether Gragg's use of force was reasonable cannot be determined as a matter of law. *See Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 757-59 (10th Cir. 2013) (denying summary judgment where facts pertaining to plaintiff's actions and officer's use of taser were irreconcilably in dispute). The record contains sufficient evidence from which a reasonable juror could find that Gragg's use of force was excessive. The objective reasonableness of Gragg's actions turns on whether a factfinder believes Gragg's

---

[3] Gragg makes much of the fact that Plaintiff's voluntary statement made on April 3, 2014, suggests Plaintiff's foot came off the brake before he was tasered. (*See* Doc. No. 67-1 (Plaintiff's Voluntary Statement) ("I guess my foot came off the brake and I don't remember anything else until I was tazed.")). However, when presented with this statement at deposition, Plaintiff testified that his truck did not move until after he was tasered, and that he had Twila Hollis write the statement at the hospital because he was "too nervous to write." (Plaintiff Deposition, 101:20-102:9; 114:6-114:25). The Court does not find Plaintiff's statement necessarily undermines Plaintiff's deposition testimony. It is certainly possible that Plaintiff's statement, made during a time of high stress, was not a complete or fully accurate account of the order of events on April 3. Indeed, Gragg himself admitted to making material errors in his contemporaneous Case Report. (Gragg Deposition, 180:17-181:9).

version of events over that of Plaintiff's. Accordingly, summary judgment is inappropriate on this issue.

### B.    Failure to Intervene – Barber

Plaintiff alleges Barber violated Plaintiff's Fourth Amendment right to be free from excessive force by failing to intervene or render assistance to Plaintiff when Gragg used excessive force on Plaintiff. (Doc. No. 3, ¶¶ 47, 49, 65). Barber argues this claim fails, because there is no evidence Barber had a realistic opportunity to prevent the alleged excessive force.

An officer who fails to intervene to prevent a fellow officer's use of excessive force may be held liable under § 1983. *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008). The officer need not actually participate in the use of excessive force to be held liable under § 1983. *Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011). "Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Id.* (citation omitted).

Plaintiff argues summary judgment is inappropriate with respect to Barber, because it is in dispute whether Barber could have moved to prevent Gragg's excessive force, and it is in dispute where Barber was located at the time Gragg applied the force against Plaintiff. The Court finds Plaintiff's argument unpersuasive. Plaintiff's only evidence in support is that Barber's Case Report does not document where Barber was standing relative to Plaintiff's truck. (Barber Case Report). However, at his deposition, Barber testified he was standing near the rear passenger side of the truck when Gragg approached Plaintiff, and he moved around the vehicle behind Gragg after the truck started rolling. (Barber Deposition, 22:18-23:3). Barber testified he was not in a position to act to protect Plaintiff during the disputed events. (Barber Deposition, 37:22-38:14). Patty Guthrie also testified Barber was eight to ten feet behind her on the driver's

side of the truck at the time the truck stopped rolling, which indicates Barber was not close enough to Gragg or Plaintiff to intervene in the scuffle. (Patty Guthrie Deposition, 65:12-20). Patty Guthrie and Twila Hollis both agreed the incident was over in a matter of seconds. (Doc. No. 54-8 (Hollis Deposition), 47:13-18; Patty Guthrie Deposition, 65:21-25). Plaintiff offers no evidence to dispute this testimony, which shows Barber had no opportunity to intervene during the few seconds in which the struggle took place. Accordingly, Barber is entitled to summary judgment on Plaintiff's § 1983 claims against him.

### C. Qualified Immunity – Gragg and Barber

Gragg and Barber also contend they are entitled to qualified immunity from personal liability for the § 1983 claims alleged against them in this case. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, in a § 1983 action in which the affirmative defense of qualified immunity from liability is at issue, the plaintiff bears the burden to show (1) the defendant's conduct violated their constitutional rights, and (2) those rights were clearly established at the time of the defendant's alleged misconduct. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

To convince the court that the law at the time of defendant's actions was clearly established, the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Hilliard v. City and County of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). (quotation omitted). Generally, for a right to be "clearly established," "there must be a Supreme

Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Fogarty*, 523 F.3d at 1161 (quotation omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quotation omitted). Rather, the relevant inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quotation omitted). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," and immunity may be denied only "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded" that the conduct was lawful at the time the defendant acted. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As explained above, Plaintiff has failed to demonstrate Barber's conduct violated Plaintiff's Fourth Amendment rights governing excessive force claims by failing to intervene in Gragg's actions. Plaintiff's failure to satisfy the first prong of the qualified immunity analysis renders it unnecessary for the Court to consider whether Plaintiff satisfied his burden under the second prong. *See Hinton*, 997 F.2d at 780.

However, for the reasons explained above, Plaintiff has demonstrated Gragg committed a possible constitutional violation against Plaintiff by grabbing his arm and tasering him in circumstances where it was not objectively reasonable to do so. Plaintiff alleges deprivation of his Fourth Amendment right to be secure against excessive force administered by agents of government. According to Plaintiff's version of events, Plaintiff never attacked or otherwise physically resisted Gragg, and Gragg grabbed Plaintiff's arm and tasered him without provocation. The first prong of the qualified immunity analysis is satisfied in Plaintiff's favor.

With regard to the second prong, Plaintiff argues Gragg violated Plaintiff's "clearly established" right to be free from the use of excessive force. Gragg argues that, in the specific context of this case, Plaintiff cannot show that Gragg violated his clearly established constitutional right against excessive force. The Court disagrees. Plaintiff's evidence suffices to allege a Fourth Amendment claim under clearly established law. By 2014, it was clearly established law in the Tenth Circuit that use of a taser on a subject who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force. *Casey*, 509 F.3d at 1281, 1285 (use of force, including a taser, against a suspect who had committed a nonviolent misdemeanor, and who did not flee or actively resist arrest, was unlawful). Here, according to Plaintiff's version of the facts, Gragg physically attacked and fired his taser at a calm sixty-nine-year-old man who was not under arrest and who had committed no crime. Plaintiff had responded calmly to Gragg's demand that Plaintiff step out of the truck with a reasonable request to counsel his daughter for a few minutes. Gragg had no objectively reasonable ground for believing that a "hostage situation" existed or that Plaintiff posed a threat to Gragg or others. Plaintiff did not physically resist Gragg at any point. Under these circumstances, taken as true, Gragg's use of force was clearly not objectively reasonable.

Accordingly, Gragg is not shielded from liability with respect to Plaintiff's Fourth Amendment claims. His request for qualified immunity from the First and Third Causes of Action is denied.

## II.     Defendant Board

Plaintiff asserts two claims under the OGTCA against the Board: (1) excessive force/assault and battery and (2) false imprisonment. Plaintiff also seeks punitive and exemplary damages from Board. The Board asserts it is entitled to summary judgment on these claims.

## A.    Excessive Force/Assault and Battery

The Board makes two claims for immunity on this claim.  First, the Board argues it is immune from suit for Plaintiff's "assault and battery" claim because an assault and battery would necessarily have occurred outside the scope of Gragg's employment.  As the Board correctly points out, relief under the OGTCA against a political subdivision is not available "for any act or omission of an employee acting outside the scope of the employee's employment.  OKLA. STAT. tit. 51, § 153(A).  "Scope of employment" is defined in the OGTCA as "performance by an employee acting *in good faith* and within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . ." OKLA. STAT. tit. 51, § 152(12) (emphasis added).  Under Oklahoma law, when "the tort cause of action sued upon requires proof of an element that necessarily exclude good faith conduct on the part of governmental employees, there can be no liability against the governmental entity in a [O]GTCA-based suit." *Fehring v. State Insurance Fund*, 19 P.3d 276, 283 (Okla. 2001), *overruled in part by Gowens v. Barstow*, 364 P.3d 644, 652 (Okla. 2015).

The Board correctly states the general rule that an assault on a third person is not within the scope of an employee's authority.  See *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 867 P.2d 1241, 1245 (Okla. 1993).  However, the Board fails to note the well-established exception to this rule:  intentional torts may be committed within the scope of employment, when such acts are "incidental to and done in furtherance of the business of the employer even though the servant or agent acted in excess of the authority or willfully or maliciously committed the wrongs." *Baker v. Saint Francis Hospital*, 126 P.3d 602, 605 (Okla. 2005) (citations omitted). "This is not to say that the commission of the tort was within the scope of the employee's authority, for no authority for such commission could be conferred, but where the employee was

acting within the scope of authority to do the particular thing rightfully that was subsequently done in a wrongful manner." *Id.* (citations omitted). *See Perry v. City of Norman*, 341 P.3d 689, 691 (Okla. 2014) (finding "employer liability extends when an employee's conduct is an assault of excessive force if the conduct also occurs within one's scope of employment."); *id.* at 691-93 nn.7-12 &14 (citing cases in which claims proceeded under the OGTCA based on assaults of excessive force).[4]

Accordingly, Plaintiff's claim of "assault and battery," encompassed within his "excessive force" claim, may have occurred within Gragg's scope of employment. Here, the facts are not so clear that the Court can decide, as a matter of law, that Gragg's alleged intentional acts of grabbing Plaintiff's arm and tasering Plaintiff without provocation were "so far removed from any work-related endeavor and geared, instead, toward a personal course of conduct unrelated to [his] work" that it would not be appropriate to hold the Board responsible for his acts. *Baker*, 126 P.3d at 607. Accordingly, the Court denies the Board's request for summary judgment on this basis.

Second, the Board asserts immunity from Plaintiff's excessive force claim on the ground that Plaintiff's claim results from "the method of providing . . . police [or] law enforcement . . . protection." OKLA. STAT. tit. 51, § 155(6). In support, the Board cites *Schmidt v. Grady County*, 943 P.2d 595, 598 (Okla. 1997), in which the Oklahoma Supreme Court held, "subsection 155(6) provides immunity for a political subdivision for liability from personal injuries resulting from the acts of its employees acting within the scope of their employment in taking into protective

---

[4] The Board's citations in support of its position that it cannot be held liable for assault and battery under the OGTCA are inapposite, because they address claims for assault and battery separately from excessive force claims. *See Craig v. City of Hobart*, 2010 WL 680857, at *4 (W.D. Okla. Feb. 24, 2010); *Burns v. Holcombe*, 2013 WL 3154120, at *15 (E.D. Okla. June 21, 2013); *Grinstead v. Billings*, 2014 WL 1453455, at *3 (E.D. Okla. Apr. 14, 2014). Here, Plaintiff's assault and battery claim is encompassed within his excessive force claim in the Second Cause of Action.

custody and transporting a person to the county jail." *See also Kruzhkov v. State*, 144 P.3d 186, 192 (Okla. Civ. App. 2006) (state was immune under § 155(6) from officer's failure to protect intoxicated motorist from being hit by car while walking home, after officer decided not to arrest him on condition he park his vehicle and walk to nearby phone).

Applying this principle, the Board argues Gragg committed the alleged excessive force on Plaintiff in the course of attempting to provide police protection to Denise Grimes, who was suicidal. Therefore, the Board is immune under § 155(6). Plaintiff did not respond to this argument. Nonetheless, the Court is obliged to consider this issue on the merits, and the Court finds the Board's position to be unavailing. Section 155(6) applies to injury to a person who was the subject of the police protection. *See Schmidt*, 943 P.2d at 596-97 (county held immune under § 155(6) when plaintiff was injured as defendant officer took plaintiff into protective custody to prevent her from harming herself or others and from being harmed by others). However, § 155(6) does not apply when an officer injures a person who is the subject of *law enforcement*. In *Salazar v. City of Oklahoma City*, 976 P.2d 1056 (Okla. 1999), which the Board cites, the Oklahoma Supreme Court distinguished *Schmidt* and found the City was not shielded under § 155(6) for its officer's actions in mistakenly arresting and holding the plaintiff, because the City stood "vis-à-vis [the plaintiff] "not as 'protector,' but qua 'law enforcer.'" *Id.* at 1065. "A scenario in which a law enforcement function is negligently carried out—as in actions incident to arrest or imprisonment—must be distinguished from negligently providing protective services. The former activity is unshielded by the § 155(6) immunity." *Id.* at 1066. Here, Mrs. Grimes, not Plaintiff, was the protected subject on April 3, 2014, and Plaintiff was allegedly injured as a result of Gragg's carrying out law enforcement duties. By Gragg's own account, he believed (reasonably or not) that Plaintiff was the perpetrator of a hostage situation and that he was acting

to protect Mrs. Grimes *from* Plaintiff. (Gragg Deposition, 163:2-6). Accordingly, the Board is not immune under § 155(6).

Finally, the Board argues that, even if § 155(6) does not apply, it is nonetheless entitled to summary judgment as to Plaintiff's state law excessive force claim, because Gragg's actions were "objectively reasonable" and Gragg is similarly entitled to summary judgment. *See Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dep't*, 230 P.3d 869, 878-81 (Okla. 2010) (noting a police officer's use of force is subject to an objective reasonableness standard under Oklahoma law). However, for the reasons explained above with respect to Plaintiff's § 1983 claim, the Court cannot conclude as a matter of law that Gragg's uses of force against Plaintiff were objectively reasonable. The Board is not entitled to summary judgment on Plaintiff's excessive force claim with respect to Gragg's actions.[5]

### B.     False Imprisonment

In the Fourth Cause of Action, Plaintiff alleges Gragg "unlawfully restrained Plaintiff's personal liberty or freedom of locomotion against Plaintiff's will by unlawfully incapacitating Plaintiff through the use of unlawful and excessive force," for which the Board is responsible. (Doc. No. 3, ¶¶ 70, 74). The Board argues Plaintiff has no actionable claim against it for false imprisonment, because the alleged detention was done by an officer with legal authority to enforce the process of law. Under Oklahoma law, false arrest and false imprisonment are virtually indistinguishable as causes of action, the only distinction being the nature of the person doing the detaining: "[I]n a false imprisonment, the detention is purely a matter between private persons for a private end, and there is no intention of bringing the person detained before a court, or otherwise securing the administration of the law"; by contrast, "in a false arrest, false

---

[5] For the reasons explained above in Part I.B., the Board is not liable with respect to Barber's alleged failure to intervene.

imprisonment exists, but the detention is by reason of an asserted legal authority to enforce the processes of the law." *Alsup v. Skaggs Drug Center*, 223 P.2d 530, 526-27 (Okla. 1949) (quotation omitted). Applying this rule, the Court agrees that the Board cannot be held liable for false imprisonment in this case. There is no dispute that Plaintiff was detained by an officer of the law, and not by a private person. Accordingly, no actionable claim can lie for false imprisonment with respect to Gragg's actions. *See DeLong v. State ex rel. Okla. Dep't of Pub. Safety*, 956 P.2d 937, 938 (Okla. Civ. App. 1998). To the extent Plaintiff intended to plead false arrest rather than false imprisonment against the Board, Plaintiff still has no viable claim, because it is undisputed that Plaintiff was not arrested, charged, or even detained for more than a few seconds. Plaintiff points to no authority that would support a claim for false arrest under the circumstances of this case. Summary judgment is granted to the Board on the Fourth Cause of Action.

### C. Punitive Damages

Finally, the Board asserts Plaintiff cannot maintain a punitive damages claim against it, because the OGTCA prohibits an award of punitive or exemplary damages against a political subdivision for claims arising under state tort law. OKLA. STAT. tit. 51, § 154(C) ("No award for damages in an action or any claim against the state or a political subdivision shall include punitive or exemplary damages."). Plaintiff concedes the applicable law precludes an award of exemplary damages against a municipality, under both the OGTCA and § 1983. The Court agrees. Accordingly, the Board is granted summary judgment on the punitive damages claim.

### <u>CONCLUSION</u>

For the reasons outlined above, Defendant's Motion for Summary Judgment (Doc. No. 54) is **GRANTED IN PART**. Summary judgment is **DENIED** to Defendant Gragg on all

claims.  Summary judgment is **GRANTED** to Defendant Barber on all claims.  Summary judgment is **GRANTED** to the Board on the Fourth Cause of Action (False Imprisonment) and on the claim for Punitive and Exemplary Damages.  Summary judgment is **DENIED** to the Board on the Second Cause of Action with respect to the actions of Defendant Gragg.

      **IT IS SO ORDERED** this 8th day of July, 2016.

James H. Payne
United States District Judge
Eastern District of Oklahoma